NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250676-U

NO. 4-25-0676

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 1, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| WESLEY M. ELAM, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Adams County |
| BRIAN BRINKMAN and HY-VEE, INC., | ) | No. 20L47 |
|     Defendants-Appellants. | ) | |
| | ) | Honorable |
| | ) | Scott D. Larson, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the jury's verdict for plaintiff in a negligence suit following a traffic collision, finding (1) defendants failed to provide a sufficient record to allow review of their claim that the trial court improperly refused to provide a jury instruction on impairment, (2) defendants forfeited their claim that the court improperly allowed plaintiff to introduce evidence of permanent injury or future pain and suffering, (3) defendants forfeited their claim that the court should have removed the line on the jury verdict form for "earnings lost," (4) the court properly applied the collateral source rule and excluded evidence that plaintiff's medical bills were satisfied for less than the full amount charged, (5) the court properly barred defendants' proposed expert witnesses from testifying after defendants provided insufficient pretrial disclosures under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018), (6) the court did not abuse its discretion in admitting into evidence a photograph of the intersection with a stop sign that was not present at the time of the collision, (7) the court did not abuse its discretion in admitting evidence that one of the defendants pleaded guilty to a traffic citation after the collision, (8) the court did not abuse its discretion in excluding evidence of plaintiff's prior traffic citations, and (9) defendants forfeited their claim that the court improperly denied their motion for judgment notwithstanding the verdict or for a new trial.

¶ 2    On August 1, 2020, plaintiff, Wesley M. Elam, was driving a motorcycle in Quincy,

Illinois, when he collided with a car driven by defendant, Brian Brinkman. Plaintiff sued Brinkman, as well as his employer, Hy-Vee, Inc., for negligence. A jury found for plaintiff, but it also found plaintiff was responsible for 35% of the damages. Ultimately, the jury awarded plaintiff net damages of $345,308.

¶ 3        Defendants appeal, arguing the trial court erred in (1) denying the proposed jury instruction on impairment, (2) admitting evidence of and allowing the jury to consider permanent injury and future pain and suffering, (3) including a line for lost wages on the verdict form, (4) preventing defendants from cross-examining plaintiff's witness to contest the reasonableness of plaintiff's medical bills, (5) barring testimony from defendants' experts, (6) allowing the jury to see a photograph of the intersection with a stop sign that was not present at the time of the collision, (7) admitting Brinkman's plea of guilty to a traffic citation into evidence, (8) barring evidence of plaintiff's prior traffic citations, and (9) denying defendants' motion for judgment notwithstanding the verdict (*n.o.v.*) and motion for a new trial.

¶ 4        We affirm.

¶ 5                              I. BACKGROUND

¶ 6        In September 2020, plaintiff filed a two-count complaint against defendants. He alleged that on August 1, 2020, he was riding a motorcycle in Quincy, Illinois, and he collided with the vehicle Brinkman was driving. Count I alleged that Brinkman's negligence caused the collision, permanently injuring plaintiff. Count II alleged that Brinkman was driving a vehicle owned by Hy-Vee, Inc., that he was acting within the scope of his employment at the time of the collision, and that Hy-Vee, Inc., was liable for the resulting damages.

¶ 7        In April 2021, plaintiff moved for summary judgment. As part of their response to plaintiff's motion, defendants filed a set of exhibits, including a purported "Illinois Driving

Record" for plaintiff. This document listed seven purported traffic citations for plaintiff from 2013 to 2019, including failure to pay fines, squealing or screeching tires, speeding 15 to 25 miles per hour over the speed limit, driving without a valid license or permit, speeding 26 to 34 miles per hour over the speed limit, driving with a suspended license, and speeding 11 to 14 miles per hour over the speed limit. Plaintiff filed a motion *in limine* to bar defendant from introducing these citations into evidence. The trial court denied plaintiff's motion for summary judgment and granted his motion *in limine* to bar the citations.

¶ 8 Before trial, defendants disclosed Warren Beine and Dr. Tuvi Mendel as potential expert witnesses at trial. Defendants stated that Beine was an "accident reconstructionist," with experience in the United States Army Military Police and other police departments from 1974 to 2018. Defendants stated that Beine would testify to plaintiff's "impaired abilities to properly and safely operate his vehicle with Amphetamine, hallucinogenic drug [tetrahydrocannabinol (THC)] and Opiates in his system." As the basis for Beine's conclusions, defendants stated, "His expertise, review of records, and including pictures and visiting the crash site. All the records have either been produced by the parties or publicly available." For Dr. Mendel, an orthopedic surgeon, defendants disclosed the following opinion: "The care and treatment to the left shoulder subsequent to [plaintiff's] discharge, including the care, treatment, and surgery in 2022, is not causally related to the collision which occurred on August 1, 2020."

¶ 9 Plaintiff filed a pretrial motion to prohibit defendants from introducing testimony from Beine and Mendel. For Beine, the trial court ruled "there [was] inadequate and insufficient disclosure for Mr. Beine's opinion regarding causation of the accident by plaintiff's impaired abilities to properly and safely operate his vehicle." The court explained, "In the disclosure there are no specific reports or medical records that Mr. Beine relied upon in support of his opinion and

- 3 -

a generalized review of medical records is not sufficient disclosure of the basis for his opinion." The court added,

> "To allow Mr. Beine to testify as to this opinion would amount to surprise to the plaintiff, as there was nothing disclosed to identify what facts or reports Mr. Beine relied upon to form the basis of his opinion regarding causation of the accident by plaintiff's impaired abilities to properly and safely operate his vehicle."

The court also found Beine's disclosed *curriculum vitae* did not demonstrate sufficient expertise for him to offer an opinion on plaintiff's impairment. However, the court refused to bar all of Beine's testimony or opinions, allowing defendants to introduce the portions of Beine's accident reconstruction report and conclusions that the court had not specifically prohibited.

¶ 10 The court also denied plaintiff's motion to bar Dr. Mendel from testifying, finding that Dr. Mendel could testify to the disclosed opinion that some of plaintiff's later medical treatments did not result from the collision on August 1, 2020. However, the court stated, "There is no disclosed opinion that the doctor will testify that the plaintiff was or was not impaired at the time of the accident."

¶ 11 Additionally, the trial court granted plaintiff's motions to bar defendants from introducing evidence of plaintiff's prior traffic citations, evidence related to collateral sources of payment for plaintiff's damages, and opinions from any Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018) witness that defendants did not specifically disclose.

¶ 12 Defendants also filed a motion *in limine*, requesting that plaintiff be barred from introducing certain evidence. The court barred plaintiff from introducing evidence of plaintiff's permanent injury, brain trauma causing memory issues, permanent disfigurement or future pain and suffering, although the court added, "Plaintiff can testify as to his past and present state of

- 4 -

health." The court further ordered that plaintiff could introduce evidence of Brinkman's plea of guilty to a traffic citation resulting from the collision. Finally, the court reserved ruling on defendants' motion to prohibit evidence of plaintiff's lost wages.

¶ 13     The case proceeded to trial in March 2025. On the second day of trial, defense counsel asked the trial court to bar evidence that Brinkman was issued a traffic citation after the collision and later pleaded guilty to that citation. The trial court ruled the citation and plea, "standing alone," were not "sufficient" evidence of liability, but plaintiff could still admit them into evidence if there was other evidence.

¶ 14     Quincy police officer Stephanie Yates testified she was dispatched to the intersection of 6th Street and Cherry Street in Quincy on August 1, 2020. When she arrived, she saw paramedics attending to plaintiff, who was lying on the sidewalk with a "bone that was sticking out of his lower extremity." Brinkman was also there, and he had been driving a Mini Cooper. According to Officer Yates, Brinkman told her that he approached the yield sign at the intersection, "[l]ooked both ways, didn't see anybody coming, so he thought it was safe to proceed through the intersection." After her memory was refreshed, she testified that Brinkman told her that he "stopped at the yield sign." Officer Yates issued Brinkman a citation for failure to yield the right-of-way. The citation was introduced into evidence.

¶ 15     Officer Yates testified that 6th Street was a "through street," with no stop signs or yield signs, and Cherry Street had yield signs on either side of the intersection. She explained that drivers on Cherry Street must yield to traffic driving north to south on 6th Street, regardless of who reaches the intersection first. In August 2020, the speed limit at that location was 30 miles per hour. On cross-examination, Officer Yates testified that the motorcycle struck Brinkman's vehicle on the front passenger side.

¶ 16        Brinkman testified that on August 1, 2020, he was employed as a delivery driver for Hy-Vee, Inc. That morning, he was acting in the course of his employment and driving a Mini Cooper owned by Hy-Vee, Inc. He drove in the neighborhood around 6th and Cherry Streets often, and he knew that intersection had a yield sign on Cherry Street. He acknowledged there was no yield sign or stop sign on 6th Street. He also testified that, on the day in question, he stopped at the yield sign, looked both ways, and, when he saw no one was coming, drove forward. He did not see the motorcycle until it hit his car. He never heard the motorcycle. He did not remember how fast he was going, and he did not know how fast the motorcycle was going. He agreed that when he and plaintiff collided, plaintiff "went shooting across the hood of [his] car," onto the curb. At the moment of impact, he believed he was in the middle of the intersection, but he also could have been approaching the center.

¶ 17        Plaintiff's counsel showed Brinkman a copy of his guilty plea to his traffic citation, and defense counsel said, "There's no objection to that based on the prior Court's ruling." Brinkman then acknowledged that he received a ticket for failure to yield after the collision and pleaded guilty. Plaintiff's counsel asked that the guilty plea be published to the jury. The trial transcript states as follows:

> "[DEFENSE COUNSEL]: Subject to the Court's earlier…
>
> THE COURT: Understood. It can be published.
>
> (Reporter interjection.)
>
> THE COURT: Previous court's ruling.
>
> Off the record.
>
> (Discussion held off the record.)
>
> THE COURT: Okay. Back on the record.

- 6 -

[PLAINTIFF'S COUNSEL]: Thank you.

(Plaintiff's Exhibit 6 was published to the jury.)"

Brinkman admitted that the published document was his plea of guilty to failure to yield the right of way.

¶ 18      At the end of Brinkman's testimony, the trial court commented that the guilty plea was admitted without objection. Defense counsel commented that he had objected, but the court answered, "No. You didn't, and it was published." Defense counsel responded, "Oh, the—oh, you're—I thought you were talking about a different document with Officer Yates. Okay."

¶ 19      Brittney Welch testified she used to live near the intersection of 6th and Cherry Streets in Quincy. On August 1, 2020, she was outside in her driveway at around 11 a.m. She had a clear view of the intersection and saw the collision. She testified she saw the Mini Cooper, and "the driver was looking around and was kind of just going slow as if he was looking for something." She did not see the motorcycle "until he was about a fourth of a block away from the intersection." She stated that the motorcycle was not "going super slow or super fast. He just appeared to be coming down the road normal." The Mini Cooper was "creeping on Cherry Street," and the two vehicles collided in the middle of the intersection. When Welch was asked if the Mini Cooper stopped before the intersection, she answered, "I don't know that he came to a complete stop," and she saw him "moving slowly creeping along." Welch testified that when the vehicles collided, the driver of the motorcycle slid on the curb near her, and "part of his scalp was ripped off. He had an open fracture in his leg, and his collarbone appeared to be out of place." She put pressure on his head and yelled for help.

¶ 20      Plaintiff's counsel showed Welch a picture of the intersection. She testified that it showed the view from her neighbor's driveway. She was present when the picture was taken,

around one year after the collision. Plaintiff's counsel asked if the picture fairly and accurately portrayed the view of 6th Street on the day of the accident. Welch answered, "Yes. There is one thing different." The court held a discussion with the attorneys off the record. Welch then reiterated that the image accurately depicted her view of the intersection. The image was shown to the jury. On cross-examination, Welch agreed that the stop sign in the image was not there at the time of the collision. Instead, there was a yield sign.

¶ 21　　　　Dr. Jose Acevedo's testimony from an earlier evidence deposition was read to the jury. Dr. Acevedo testified he was an orthopedic surgeon and had treated plaintiff for a little over two years after the collision. He testified to plaintiff's injuries, including shoulder and left rib fractures, a head injury, and broken bones in both legs. He described the treatment plaintiff received for his injuries. Dr. Acevedo also testified that plaintiff was "more prone to injury and future problems on his left shoulder," and he thought the shoulder injury would be a "chronic problem."

¶ 22　　　　On cross-examination, defense counsel asked about a drug screen from the day of the crash, in which plaintiff had tested positive for amphetamines, THC, and opiates. Defense counsel asked if these were "elicit [*sic*] drugs," and Dr. Acevedo answered,

> "Yes. It depends on the time of the drawing, what you would need to look in terms of opiates, but—because patients do get opiates for pain at the emergency room. But if this was before he was given anything, then, yes, it would be illicit drugs, all of them."

¶ 23　　　　Dr. Darr Leutz's evidence deposition was then read to the jury. He testified he was an orthopedic surgeon and performed plaintiff's shoulder surgery. He detailed plaintiff's shoulder injury and the surgery that occurred about two years after the collision. He agreed that the medical

costs from the surgery, which were more than $70,000, were "necessary as a result of the left shoulder injury that [plaintiff] sustained on August 1st, 2020." When asked if he agreed with Dr. Acevedo that plaintiff would be more prone to injury of his left shoulder, Dr. Leutz answered that plaintiff would have a higher chance of arthritis, and the damaged cartilage would never completely heal.

¶ 24 Outside the presence of the jury, the attorneys argued before the trial court over defense counsel's request that he be allowed to cross-examine plaintiff's witness, Cheryl Johnson, regarding plaintiff's medical bills. According to defense counsel, plaintiff's attorney claimed in opening statements that plaintiff incurred $213,000 in medical bills. Defense counsel insisted that this statement opened the door to challenges to plaintiff's actual medical expenses, and defense counsel sought to cross-examine the witness to show only about $35,000 was actually paid. Plaintiff's counsel insisted that defense counsel could not introduce any evidence of insurance, Medicaid, or the amount that was ultimately accepted for plaintiff's medical bills. The court found that plaintiff's opening statement was not relevant and defense counsel could not ask if this provider "charges the same service at different rates based upon the payor, meaning Medicaid, insurance, and the like," although defense counsel could ask if the provider advertised different rates or if "another entity in the community has a far cheaper rate."

¶ 25 Johnson, the director of patient financial services at Blessing Hospital (Blessing), testified that she was familiar with Blessing's billing and recordkeeping practices, as well as the typical charges for medical services by other nearby medical providers. A bill for plaintiff's services at Blessing between August 1, 2020, and late 2022 was admitted into evidence. Johnson testified that the charges were "usual and customary" for Blessing and for other similarly situated medical providers. The charges listed totaled $213,993.27. She opined that the charges listed were

reasonable.

¶ 26    On cross-examination, defense counsel asked if the billing department applied discounts to the bill. Plaintiff's counsel objected, the trial court sustained the objection, and defense counsel made an offer of proof outside the presence of the jury. Johnson stated that the billing department had discounts based on contracts with other entities. When asked, "[T]he fee schedule agreements or the contracts define what is reasonable, don't they?" she answered, "For certain payers, yes." She was asked if Blessing routinely accepted an amount much less than what was charged for the services, and she answered, "Based off contracts, yes, at the times." She explained that plaintiff himself was not responsible for any of his payments. Instead, Blessing sent the bill for $213,993.27 to the "payer source" and accepted an amount of less than $35,000 in payment, which Johnson testified was a reasonable amount.

¶ 27    Plaintiff testified that in July 2020, he worked as a welder for Hollister-Whitney, and he worked there at the time of trial. However, a couple of weeks before the collision, he had been laid off for missing too many days of work. By the time of the collision, he had begun the process of appealing the layoff and requesting his job back.

¶ 28    Plaintiff testified that on August 1, 2020, he had a Harley-Davidson motorcycle, and this motorcycle was "deafening. It was loud, super loud." It won the "loudest bike" title at motorcycle shows in 2017 and 2018.

¶ 29    Plaintiff testified that as he was riding on August 1, 2020, and he was "doing the speed limit, paying attention." Cherry Street had a yield sign on both sides. He remembered getting to about a quarter block away from the intersection, seeing a Mini Cooper "driving slowly toward the intersection," and expecting the Mini Cooper to stop. His next memory was waking up in the hospital. He testified that that morning and the previous two days, he did not use any

methamphetamine, cannabis, or heroin. When he woke up at the hospital, he was unable to move, and he was in "excruciating pain." Photographs of his injuries were admitted into evidence.

¶ 30 Plaintiff testified that immediately after the collision, he was not able to work. He was discharged from the hospital in a wheelchair, and he was not able to walk for "a couple months." Later, he used a cane for "three, four, five months." He estimated that, at the time of the trial, his leg was "80, 85 percent" recovered. It bothered him "on a daily basis." He used to run and play basketball or soccer with his children, but he no longer did. He returned to work as a welder and fabricator at Hollister-Whitney in October 2023. He had to pass a physical examination to return to work. When he was previously laid off, his income was $14 or $16 per hour, and he worked from 40 to 55 hours per week. He acknowledged he had convictions in 2022 for possession of methamphetamine and possession of a stolen weapon.

¶ 31 Plaintiff testified that, immediately after the collision, he had memory loss and needed to put notes around his house to remind him of appointments. He claimed that he was "not completely better" by the time of trial. He still had a scar on his head. He estimated that his shoulder was "75 percent better." He was asked, "Since August 1st of 2020, what's the worst thing that's happened to you?" He answered,

> "I couldn't work. I couldn't—my mental, that's the worst thing that happened. I mean, you know how hard it is not knowing how you're going to pay your rent, not knowing—knowing that you can't go to work, knowing that you're— you hurt all the time. I mean, it's my mental. My mental is the worst part of all of it."

On cross-examination, he testified that he had never driven impaired or under the influence of drugs.

¶ 32 Defense counsel moved for a directed verdict, but the trial court denied the motion.

¶ 33 Defendants presented a video evidence deposition from anesthesiologist Dr. John Dooley. Defense counsel showed Dr. Dooley a document, and Dr. Dooley testified the document was a set of laboratory results from plaintiff from August 1, 2020, including drug screens. The tests showed positive results for amphetamines, THC, and opiates. Dr. Dooley testified that amphetamines often produce "a feeling of invincibility," and THC and opiates "depress reaction time and sensory input in a timely fashion to avoid things that could be destructive." He explained, "[T]he use of marijuana and [methamphetamines] are consistent with the drug screen findings and results," adding, "[I]t could very well explain impairment while driving a motor vehicle."

¶ 34 On cross-examination, Dr. Dooley testified that he estimated he spent a total of about three hours on this case before the day of the deposition. He acknowledged that his opinions that plaintiff had drugs in his system were based most significantly on three lines on the lab report. He then testified that the drug test reflected that it was based on a sample collected on August 1, 2020, at 10:39 p.m., approximately 11 hours after the collision. Dr. Dooley acknowledged that the drug screen was administered after plaintiff had been seen in the emergency room. He further testified that he was not aware of the medication administrated to plaintiff before the test. He was not aware that plaintiff was administered morphine, hydromorphone, and other pain medication. He acknowledged the hypothetical possibility of an adulterated sample. He was asked, "Could you swear to the accuracy of these tests, or you're just saying that you believe that they're reliable and that forms part of your opinion?" He answered, "I can't swear to the accuracy of the tests. I can— I can swear to the fact that if the test results are reliable, then it substantiates my opinion." Dr. Dooley also acknowledged that the lab report contained the following provisions:

"These are qualitative test results that are to be used for medical, *i.e.*[,] treatment

purposes only. A more specific chemical method is recommended if confirmation is required. Unconfirmed test results must not be used for nonmedical purposes, *i.e.*, employment or legal testing."

Dr. Dooley testified that a positive urine screen test could result from the ingestion of amphetamines "anywhere from three to four hours to 36 to 48 hours" before the test. For cannabinoids, he explained, "[I]t can be quite an extended period of time." Dr. Dooley also acknowledged that morphine is an opiate. He was asked, "Can you tell us exactly what [plaintiff] allegedly ingested and when he allegedly ingested it before this accident?" He answered, "No." Dr. Dooley could not opine on the quantity of drugs plaintiff ingested, when he ingested them, or how much his reaction time could have been affected.

¶ 35        Beine testified to his prior experience involving accident reconstruction, including his career in law enforcement, his involvement in other cases involving passenger vehicles, and his training in related subjects. He prepared a report analyzing the crash based on the police report, his visit to the intersection, a medical report, and other documents. He estimated that the collision occurred 41 feet from the yield sign. He also concluded that plaintiff was driving over the speed limit. He acknowledged that his calculations relied on a speed limit of 25 miles per hour. He later learned the speed limit was 30 miles per hour, but this did not alter his conclusions.

¶ 36        Outside the presence of the jury, defendants made an offer of proof. Beine described his training and experience in recognizing and analyzing driver impairment. Defense counsel asked, "[D]id you make a finding based on what you reviewed on the toxicology report and anything else as to whether [plaintiff] was impaired at the time of this accident?" Beine answered, "I don't know what the rules in Illinois are for impairment, but there is—obviously, there would be some concern about his perception and reaction time." Beine opined that plaintiff was likely

impaired at the time of the collision

¶ 37        Dr. Mendel's video deposition was shown to the jury. He reviewed plaintiff's medical treatment and offered various opinions on the treatment plaintiff received. He was not asked about plaintiff's impairment at the time of the collision.

¶ 38        The record from the final day of trial is not included in the record on appeal.

¶ 39        Defendants proposed the following jury instruction:

> "Impaired is no excuse for failure to act as a reasonably careful person would act. An intoxicated person is held to the same standard of care as a sober person. If you find that [insert allegedly impaired person] was intoxicated at the time of the occurrence, you may consider that fact, together with other facts and circumstances in evidence, in determining whether [insert allegedly impaired person] conduct was [negligent] [willful and wanton] [or] [contributorily negligent]." Illinois Pattern Jury Instructions, Civil, No. 12.01 (2009).

The trial court denied this instruction.

¶ 40        The jury returned a verdict in plaintiff's favor in the net amount of $345,308. The verdict form included a line for "[t]he pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries," for which the jury decided on $155,250 in damages. The verdict form also included a line for "[t]he earnings lost," for which the jury decided on damages of $6,750. The jury allocated 35% of the responsibility for the damages to plaintiff and the remaining 65% to defendants.

¶ 41        After trial, defendants filed a motion for judgment *n.o.v.* or for a new trial, which the trial court denied.

¶ 42        This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44        Defendants appeal. Because of the gaps in the record on appeal, as well as

defendants' failure to preserve or explain their claims, many of defendants' arguments are

forfeited. Their remaining arguments lack merit. Accordingly, we affirm.

¶ 45                        A. Jury Instruction on Impairment

¶ 46        First, defendants contend the trial court erred in denying the proposed jury

instruction on impairment. Defendants proposed a modified version of Illinois Pattern Jury

Instruction, Civil, No. 12.01 (2009) on "Intoxication," but the court refused to provide this

instruction. "Generally, all parties are entitled to jury instructions on their respective theories,

provided there is some evidence to support this theory." *Lundquist v. Nickels*, 238 Ill. App. 3d 410,

431 (1992). Defendants here insist they introduced "undisputed evidence in this case that Plaintiff

was impaired at the time of the accident." We review the trial court's decision to grant or deny a

requested jury instruction for an abuse of discretion. *Johnson v. Advocate Health & Hospitals

Corp.*, 2025 IL App (1st) 230087, ¶ 46.

¶ 47        Defendants have failed to provide a record of the jury instructions conference held

on the last day of trial. "It is the appellant's duty to present the court with a proper record on appeal,

so that the court has an adequate basis for reviewing the decision below." *Midwest Builder

Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 655 (2007). "Where the issue on

appeal relates to the conduct of a hearing or proceeding, this issue is not subject to review absent

a report or record of the proceeding." *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001). Without a

sufficient record, "it will be presumed that the order entered by the trial court was in conformity

with the law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

Indeed, "[a]ny doubts which may arise from the incompleteness of the record will be resolved

against the appellant." *Id.*

¶ 48    Here, because we have no transcript of the jury instructions conference, we have no record of defense counsel's claims before the trial court or, more importantly, the court's reasons for denying the proposed instruction. Therefore, we presume that the court acted in conformity with the law and did not abuse its discretion, and we deny defendants' claim. See *id.*

¶ 49          B. Permanent Injury and Future Pain and Suffering

¶ 50    Before trial, defendants filed a motion *in limine* to prevent plaintiff from introducing evidence of permanent injury or future pain and suffering. The trial court granted the motion, but it stated it would allow plaintiff to testify "as to his past and present state of health." First, defendants argue that the court erred in failing to prevent plaintiff from testifying in violation of this order. Second, defendants assert that plaintiff failed to provide the required pretrial disclosure of qualified medical providers who would testify to plaintiff's permanent impairment, brain trauma, memory loss, or future pain and suffering. See Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2018) ("For each independent expert witness, the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit."). Defendants cite *Soto v. Gaytan*, 313 Ill. App. 3d 137, 143 (2000), *Ficken v. Alton & Southern Ry. Co.*, 255 Ill. App. 3d 1047, 1057 (1993), and *Phelps v. Chicago Transit Authority*, 224 Ill. App. 3d 229, 232 (1991), to argue that a physician should conduct a recent examination before testifying to permanent injury, but no physician who testified in this case conducted such an examination. Defendants contend that no qualified expert testified to plaintiff's permanent injury. Finally, defendants contend the court should have removed the line on the verdict form for plaintiff's future pain and suffering.

¶ 51    Once again, defendants have failed to provide an adequate record by failing to provide a transcript of the last day of trial. Moreover, the record on appeal does not include a

- 16 -

transcript from the motion hearing on defendants' motion *in limine* to bar evidence of future pain and suffering. We construe these gaps against the defendants.

¶ 52        More importantly, defendants have forfeited these arguments. "A court's evidentiary rulings are unreviewable on appeal if they have not been properly preserved." *Guski v. Raja*, 409 Ill. App. 3d 686, 695 (2011). "To preserve an issue for appellate review, a party must both contemporaneously object and file a timely written posttrial motion addressing it." *Walsh v. Sklar*, 2025 IL App (1st) 231830, ¶ 58. Similarly, "a litigant waives the right to object on appeal to instructions or verdict forms that were given to a jury, when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 63. To preserve the objection, the litigant also must provide a remedial instruction or verdict form. *Id.*

¶ 53        Defendants raised no objection at trial when plaintiff testified to his diminished strength in his shoulder and leg or his lasting memory loss. Likewise, defendants did not object when Dr. Acevedo testified that plaintiff's shoulder injury would be a "chronic problem" or when Dr. Leutz testified that plaintiff would have a higher risk of arthritis. Moreover, without a transcript of the final day of the trial, we cannot be sure what the attorneys or the trial court said about plaintiff's permanent injury and his proposed verdict form. Regardless, the record does not contain any alternative verdict form. Therefore, it appears that defendants failed to provide such a form and failed to preserve their objection to the verdict form. See *id.*

¶ 54        Generally, forfeiture is a limitation on the parties and not on our jurisdiction. *Walsh*, 2025 IL App (1st) 231830, ¶ 60. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) states that, in a civil case, a reviewing court "may, in its discretion, and on such terms as it deems just, *** enter any judgment and make any order that ought to have been given or made, and make any

other and further orders and grant any relief *** that the case may require." This rule is analogous to the plain error rule for appeals of criminal convictions, and it allows appellate courts to find exceptions to the general forfeiture rules. See *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967); see also *Walsh*, 2025 IL App (1st) 231830, ¶ 60. Indeed, "courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33.

¶ 55        Here, however, defendants make no effort to argue that any exceptions to the rules of forfeiture apply. Defendants do not discuss Rule 366 or ask us to overlook their forfeiture. Indeed, even after plaintiff argued in his appellate brief that defendants forfeited this claim, defendants still failed to address forfeiture at all. Therefore, defendants have forfeited any opportunity to overcome their earlier forfeiture. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Accordingly, we reject defendants' argument without considering its merits. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) (finding the defendant waived reliance on plain error review where he "neither argue[d] that the evidence was closely balanced nor explain[ed] why the error [was] so severe that it must be remedied to preserve the integrity of the judicial process."); see also *People v. De la Hera*, 2011 IL App (3d) 100301, ¶ 8 ("In this case, because the defendant failed to file a posttrial motion raising his argument and because he does not request this court to review the issue for plain error, he has forfeited the argument on appeal.").

¶ 56                                      C. Lost Wages

¶ 57        Defendants next argue the trial court erroneously included a line for damages for "earnings lost" on the verdict form.

¶ 58    Once again, defendants have failed to provide a transcript of the last day of the trial, so we interpret the gaps in the record in plaintiff's favor. See *Foutch*, 99 Ill. 2d at 392. Again, defendants failed to provide an alternative verdict form, which is required to preserve the objection on appeal. See *Baumrucker*, 2017 IL App (1st) 161278, ¶ 63. And, yet again, defendants do not acknowledge this forfeiture on appeal or argue that we should find any exception here. Defendants have forfeited this claim, and we do not address its merits.

¶ 59                    D. Medical Bills Testimony

¶ 60    The trial court prevented defense counsel from cross-examining Johnson regarding the payment of plaintiff's medical bills. Defendants claim this was reversible error. "The admission of evidence is largely within the discretion of the trial court, and its rulings will not be disturbed absent an abuse of discretion." *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007); see *Klesowitch v. Smith*, 2016 IL App (1st) 150414, ¶ 41. "The circuit court abuses its discretion when its ruling on the admissibility of evidence rests on an error of law." *Aliano v. Sears, Roebuck & Co.*, 2015 IL App (1st) 143367, ¶ 29. We review questions of law *de novo*. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

¶ 61    A plaintiff may recover reasonable medical expenses. *Verci v. High*, 2019 IL App (3d) 190106-B, ¶ 16. "In order to recover such expenses, the plaintiff must prove (1) that she has paid or become liable to pay a specific amount and (2) that the charges were reasonable for services of that nature." *Id.* Under the collateral source rule, "benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989). This rule both prohibits evidence that an insurance provider covered a plaintiff's bills and " 'bars a defendant from reducing the plaintiff's compensatory award by the amount the plaintiff received

from the collateral source.' " *Arthur v. Catour*, 216 Ill. 2d 72, 80 (2005) (quoting J. Fischer, Understanding Remedies § 12(a), at 77 (1999)). When a plaintiff seeks to recover for medical bills paid by a third party, Illinois follows the "reasonable value" approach to the collateral source rule. *Verci*, 2019 IL App (3d) 190106-B, ¶ 19. If the plaintiff establishes that a bill was reasonable, the plaintiff may introduce the entire amount billed into evidence. *Wills v. Foster*, 229 Ill. 2d 393, 414 (2008). "[E]vidence of the amount charged alone does not indicate reasonableness." *Victory Memorial Hospital v. Rice*, 143 Ill. App. 3d 621, 624 (1986). Instead, to show a bill is reasonable, the plaintiff may introduce "testimony of a person having knowledge of the services rendered and the usual and customary charges for such services." *Arthur*, 216 Ill. 2d at 82. Once a plaintiff introduces evidence that a bill was reasonable, the defendant may still refute the bill's reasonableness. Our supreme court has explained,

> "[D]efendants are free to cross-examine any witnesses that a plaintiff might call to establish reasonableness, and the defense is also free to call its own witnesses to testify that the billed amounts do not reflect the reasonable value of the services. Defendants may not, however, introduce evidence that the plaintiff's bills were settled for a lesser amount because to do so would undermine the collateral source rule." *Wills*, 229 Ill. 2d. at 418.

¶ 62    First, defendants argue plaintiff failed to meet his initial burden of providing any evidence of the reasonableness of his medical bills. Defendants claim that plaintiff provided only the amount charged, which is not sufficient to show the charge was reasonable. See *Victory Memorial Hospital*, 143 Ill. App. 3d at 624.

¶ 63    Defendants are clearly wrong. Dr. Acevedo and Dr. Leutz testified to plaintiff's injuries and to the services they provided. Dr. Leutz testified that his services were necessary.

- 20 -

Johnson, Blessing's Director of Financial Services, testified to her familiarity with Blessing's billing practices, and well as the billing practices of other similarly situated medical providers. Defendants provide no basis to refute the characterization of Dr. Johnson as a "a person having knowledge of the services rendered and the usual and customary charges for such services." *Arthur*, 216 Ill. 2d at 82. She testified that the charges for plaintiff's medical treatments were usual, customary, and reasonable. Plaintiff introduced more evidence than simply the amount charged.

¶ 64 Defendants further argue the trial court wrongly restricted their cross-examination of Johnson. They rely heavily on *Verci*. There, the plaintiff claimed the defendants' negligence resulted in an injury requiring medical treatment costing over $1 million. *Verci*, 2019 IL App (3d) 190106-B, ¶ 1. The defendants retained an expert to challenge the reasonable value of the plaintiff's medical services. This expert relied on cash prices the plaintiff's medical providers advertised online that were dramatically lower than the prices the plaintiff relied on. *Id.* ¶ 5. The trial court prohibited defendants from cross-examining plaintiff's medical providers regarding their advertised cash prices. *Id.* ¶ 13. The appellate court found this was error, stating, "[T]he range of fees [the doctor] charges for the services plaintiff received is admissible and not barred by the collateral source rule." *Id.* ¶ 25.

¶ 65 Here, defendants claim the court should have allowed them to cross-examine Johnson regarding Blessing's billing practices. Defendants cite *Verci* to argue that any evidence showing a range of amounts a provider accepts for the same services is admissible. Defendants contend evidence of different amounts a provider accepts does not violate the collateral source rule, as long as there is no reference to insurance providers. Defendants further claim they should have been able to cross-examine Johnson to show that Blessing accepted payment of less of $35,000 for the services plaintiff received, as long as they did not elicit testimony that this $35,000

resulted from an agreement with an insurance provider.

¶ 66    Defendants misinterpret *Verci*. *Verci* does not state that a defendant may introduce any evidence showing that a medical provider habitually accepts amounts lower than the charged price. Indeed, our supreme court has clearly stated that defendants may not "introduce evidence that the plaintiff's bills were settled for a lesser amount," and *Verci* does not undermine this statement. *Wills*, 229 Ill. 2d. at 418. Allowing defendants to show that Blessing accepted $35,000 as payment for plaintiff's medical bills because of a prior agreement with plaintiff's insurance provider would undermine the purpose of the collateral source rule, even if the witness did not state that Blessing's agreement was with an insurance provider. Instead, the relevant fact in *Verci* was the medical providers' public-facing advertisement of lower cash prices. The medical providers in *Verci* did not simply have existing agreements with insurers to accept lower payments as satisfaction for medical bills. Instead, those providers advertised lower charges for the same services online. There is no indication that Blessing engaged in such practices here, and the trial court rightly prevented defense counsel from cross-examining Johnson on Blessing's agreements with insurance providers.

¶ 67                    E. Defendants' Experts

¶ 68    The trial court prohibited defendants from eliciting testimony from Beine and Dr. Mendel that plaintiff was intoxicated or impaired at the time of the collision. Defendants argue on appeal that the court erred in prohibiting their testimony.

¶ 69    Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) provides:

> "Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:

> * * *

- 22 -

(3) *Controlled Expert Witnesses*. A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case."

"Rule 213 disclosures are mandatory and strict compliance is required." *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 645 (2007). Indeed, Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2018) adds, "The information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." At trial, "[a] witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion," but the witness may not provide "new reasons" for the opinion. *Lopez*, 375 Ill. App. 3d at 645. We review the trial court's evidentiary rulings under Rule 213 for an abuse of discretion. *Morrisroe v. Pantano*, 2016 IL App (1st) 143605, ¶ 38.

¶ 70                                      1. *Beine*

¶ 71            We first address Beine. Defendants disclosed that Beine would testify to plaintiff's impaired driving. Defendants also disclosed that Beine based his conclusions on "[h]is expertise, review of records, and including pictures and visiting the crash site," adding, "All the records have either been produced by the parties or publicly available." The trial court granted plaintiff's motion to bar Beine's testimony, finding he lacked adequate qualifications to opine on plaintiff's impairment and defendants failed to disclose any specific documents Beine relied on.

¶ 72            Defendants argue the court erred in barring Beine's testimony. Defendants made an offer of proof showing Beine would have testified to his background and experience assessing

whether a driver was impaired and describing how impairments could affect a driver's abilities. Beine further stated that the drugs referenced in the plaintiff's lab report could impair driving. According to defendants, Beine had sufficient credentials and adequate support for his opinions.

¶ 73    The trial court did not abuse its discretion. When disclosing the basis for Beine's opinion that plaintiff was impaired at the time of collision, defendants simply referred generally to all the records that the parties had disclosed and that were publicly available, rather than any specifically named documents. We agree with the trial court that this did not provide an adequately specific disclosure. See *Northern League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP*, 2018 IL App (1st) 172407, ¶¶ 51-52 (upholding the trial court's decision barring a controlled expert from testifying about documents that were not specifically disclosed as the bases for his opinion, despite the disclosure that the expert relied on "industry authority" and "years of experience" to form his opinion, because " 'catch-all' phrases that are not connected to a specific opinion" do not satisfy Rule 213). Although Beine referred to a lab report in defendants' offer of proof, defendants made this offer of proof during the trial, long after defendants should have disclosed the basis for Beine's opinion. Defendants' Rule 213 disclosure was insufficient, so we find no abuse of discretion.

¶ 74                    2. *Dr. Mendel*

¶ 75    Defendants later disclosed Dr. Mendel as a witness. However, the only opinion defendants disclosed for Dr. Mendel concerned the causes of the medical treatment plaintiff received for his shoulder injury. The trial court ruled Dr. Mendel could testify that the collision did not cause plaintiff's 2022 medical treatments, but the court added, "There is no disclosed opinion that the doctor will testify that the plaintiff was nor was not impaired at the time of the accident."

¶ 76       Defendants insist the court erred because an expert may elaborate on a previously disclosed opinion. See *Morrisroe*, 2016 IL App (1st) 143605, ¶ 37. Defendants assert that Dr. Mendel's opinions regarding plaintiff's impairment were a logical corollary to his disclosed opinion.

¶ 77       Defendants' unexplained assertion is simply false. Dr. Mendel's disclosed opinion concerned only the cause of plaintiff's 2022 medical treatments. Dr. Mendel's opinions on plaintiff's alleged impairment on August 1, 2020, were not a logical corollary of the causes of plaintiff's treatment in 2022, and the trial court was right to restrict Dr. Mendel's testimony.

¶ 78                         F. Photograph of the Intersection

¶ 79       Next, defendants claim the trial court erred by allowing plaintiff to show the jury a photograph of the intersection of 6th and Cherry Streets depicting a stop sign that was installed after the collision. Defendants argue the photograph was inadmissible because subsequent remedial measures are not admissible to prove negligence. See *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300 (1995). Defendants further argue the stop sign here confused the jury and caused prejudice.

¶ 80       "For a photograph to be admitted, testimony is required to establish that the photograph is a true and correct representation of what it purports to portray." *Reid v. Sledge*, 224 Ill. App. 3d 817, 821 (1992). Changed conditions will not render a photograph inadmissible "if it can be shown by testimony that after the changes are explained, the jury will be able to understand it clearly as a correct representation and not be misled by it." *Schoolfield v. Witkowski*, 54 Ill. App. 2d 111, 123 (1964); see *Warner v. City of Chicago*, 72 Ill. 2d 100, 105 (1978) ("[T]he fact that conditions had changed at the time the photographs were taken does not necessarily render them inadmissible, so long as the jury is not misled."). We review the trial court's evidentiary decisions

for an abuse of discretion. *Werner*, 377 Ill. App. 3d at 454.

¶ 81        The trial court did not abuse its discretion. The photograph was not used to show the traffic sign at the time of the collision, and it was not used to show subsequent remedial measures. Instead, plaintiff used the photograph to show Welch's clear view of the intersection where the collision occurred. Although the photograph included a stop sign that was not present in August 2020, this does not necessarily render the photograph inadmissible. There was no suggestion that the stop sign was present at the time of accident. Instead, Officer Yates, Welch, Brinkman, and plaintiff all clearly testified that there was a yield sign. When defense counsel cross-examined Welch regarding the photograph, she acknowledged the stop sign was installed at the intersection after this collision. The jury was clearly informed that the photograph depicted only Welch's line of sight, and we find no error. See *Warner*, 72 Ill. 2d at 105.

¶ 82        G. Admission of Brinkman's Plea of Guilty to a Traffic Citation

¶ 83        Defendants contend the trial court erred in admitting Brinkman's plea of guilty to a traffic citation for failure to yield into evidence.

¶ 84        Before addressing the merits of this argument, we first note that it appears defendants have forfeited this claim as well. When plaintiff's counsel showed Brinkman the guilty plea at trial, defense counsel stated there was no objection, "based on the prior Court's ruling." When plaintiff's counsel asked for the plea to be published, an off-the-record conversation took place. Later, defense counsel claimed he objected to the guilty plea form but then conceded that he was mistaken. Based on this record, it appears that defense counsel failed to make a contemporaneous objection and failed to preserve this issue. Defendants' appellate brief provides no assistance, as, once again, defendants do not address forfeiture.

¶ 85        Nevertheless, we choose to address the merits of this argument. The trial court's

decision to admit evidence is reviewed for an abuse of discretion. *Werner*, 377 Ill. App. 3d at 454. "In Illinois, a guilty plea to a traffic offense is deemed a judicial admission that is not itself conclusive, but instead merely serves as evidence against the pleader in a civil proceeding arising from the same incident." *Capsel v. Burwell*, 2024 IL App (3d) 230170, ¶ 51. Indeed, a plea of guilty to a traffic ticket, "standing alone," does not establish liability. *Gullberg v. Blue*, 85 Ill. App. 3d 389, 391 (1980); see *Harrison v. Pullens*, 83 Ill. App. 2d 245, 248 (1967) ("Proof of violation of traffic regulatory statutes, alone, is not sufficient to establish negligence sufficient to sustain liability. In must be proved that the statutory violation proximately caused the injury complained of.").

¶ 86        Here, defendants argue that the guilty plea provided the only evidence of Brinkman's negligence. Plaintiff himself did not remember the moments before the collision. According to defendants, Brinkman either stopped or moved slowly through the intersection. Defendants contend there was no other evidence of Brinkman's negligence, and the trial court should not have allowed the guilty plea into evidence.

¶ 87        First, we note that defendants have cited no cases requiring a plaintiff to introduce other evidence of negligence before a guilty plea may be admitted into evidence. Although *Capsel*, *Gullberg*, and *Harrison* all state that a guilty plea alone is not conclusive proof of liability, in each of those cases, the appellate court discussed this issue when evaluating the strength of the evidence at trial. See *Capsel*, 2024 IL App (3d) 230170, ¶ 51 (explaining that the jury was not required to find the defendant negligent, despite her guilty plea); *Gullberg*, 85 Ill. App. 3d at 391-92 (reviewing all the evidence at trial and determining the trial court rightly granted the plaintiff's motion for judgment *n.o.v.*, but acknowledging that the defendant's plea of guilty was not conclusive); *Harrison*, 83 Ill. App. 2d at 249 (upholding the jury's verdict, including its finding

- 27 -

that the plaintiffs were contributorily negligent, despite the evidence that the defendant pleaded guilty to a traffic violation). None of these cases discuss the prerequisites for admitting a guilty plea into evidence, and we are aware of no case discussing such prerequisites.

¶ 88        Regardless, here, there was other evidence that Brinkman acted negligently besides the guilty plea. The evidence clearly established there was a yield sign at the intersection. Welch testified that Brinkman was "moving slowly creeping along" in his vehicle, and she did not testify that he came to a complete stop before the intersection. Welch's testimony that she saw the motorcycle about a fourth of a block before the intersection, as well as her testimony that the motorcycle was moving at a normal speed, and the evidence that the motorcycle was extremely loud could have convinced the jury that Brinkman should have noticed the motorcycle and come to a full stop either at the yield sign or before colliding with plaintiff. Instead, Brinkman testified that he was not aware of the motorcycle at all before the moment of impact. Taken together, this evidence could indicate Brinkman failed to act with reasonable care by failing to pay adequate attention to his surroundings. There was at least some additional evidence supporting a finding of negligence, so the trial court did not err in admitting Brinkman's guilty plea.

¶ 89                    H. Plaintiff's Prior Traffic Citations

¶ 90        According to defendants, before the collision on August 1, 2020, plaintiff had seven citations for traffic violations, dating back to 2013. The trial court granted plaintiff's motion *in limine* to bar defendant from introducing these citations into evidence. Defendants argue the court erred because these citations demonstrated plaintiff's habit of reckless driving.

¶ 91        Yet again, defendants failed to preserve this issue. "When a motion *in limine* is granted, the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). "An offer of proof informs the

trial court, opposing counsel, and the reviewing court of the nature of the evidence sought to be introduced." *In re Marriage of Xinos*, 2025 IL App (1st) 232326, ¶ 25. A party who fails to make an adequate offer of proof forfeits the issue on appeal. *Id.*

¶ 92    Here, defendants submitted what they purported to be plaintiff's "Illinois Driving Record" as an exhibit in their response to plaintiff's motion for summary judgment. There is no indication in the record that defendants made any offer of proof after the trial court granted plaintiff's motion *in limine* and prohibited defendants from introducing the driving record into evidence.

¶ 93    Admittedly, "[A]n offer of proof need not be made if it is clear that the trial court understood the nature and character of the evidence that would have been offered." *In re Estate of McDonald*, 2022 IL 126956, ¶ 86. However, defendants did not cite *McDonald* or explain its application here. See *Xinos*, 2025 IL App (1st) 232326, ¶ 30 ("[Respondent] does not cite that case or explain how it applies to this case. Accordingly, he has forfeited any such argument."). Indeed, defendants failed to ever acknowledge their forfeiture, even in their reply brief, despite plaintiff's clear argument that defendants forfeited the issue. Therefore, defendants have forfeited this issue.

¶ 94                    I. Motion for Judgment *N.O.V.* or New Trial

¶ 95    Finally, defendants assert the trial court erred in denying their motion for judgment *n.o.v.* or, in the alternative, a new trial. "A directed verdict or a judgment *n.o.v.* is properly entered in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may

only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* "On appeal from the denial of a motion for judgment *n.o.v.*, we employ a *de novo* standard of review." *Brothers Future Holdings, LLC v. Indiana Insurance Co.*, 2015 IL App (1st) 141581, ¶ 32. Alternatively, the court should grant a motion for a new trial when " 'the verdict is contrary to the manifest weight of the evidence.' " *Maple*, 151 Ill. 2d at 454 (1992) (quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976)). We review a trial court's denial of a motion for a new trial for an abuse of discretion. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38.

¶ 96        Defendants do not explain their assertion that the trial court's orders were erroneous. Instead, defendants simply assert that the jury's verdict was contrary to the manifest weight of the evidence and the court denied defendants a fair trial. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's opening brief to "contain the contentions of the appellant and the reasons therefor." Moreover, "[t]his court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). By failing to present a cohesive argument, defendants have forfeited their challenge to the court's orders denying the motion for judgment *n.o.v.* and motion for a new trial, and we reject defendants' claim.

¶ 97                                III. CONCLUSION

¶ 98        For the reasons stated, we affirm the trial court's judgment.

¶ 99        Affirmed.